# CHARLESTON.

## DICKINSON v. RAILROAD COMPANY.

### March 2, 1874.

1. Although, "every material allegation of the bill not controverted by answer, shall for the purposes of the suit be taken as true, and no proof thereof shall be required" as provided by section 36 of chapter 125 of the Code of West Virginia, still, if one defendant does controvert the material allegations of the bill, by his answer, and his interest may be affected by the truth of such allegations, the failure of another defendant or defendants to do so, does not dispense with the necessity of proof, as to such allegations, as to the defendant who does controvert them, by his answer.

2. Section 5 of chapter 130 of the code of 1868 of West Virginia applies only to the records of courts held within the State.

3. An abstract as applied to records ordinarily means a mere brief, and not a copy of that from which it is taken, and a paper writing being only an abstract of an alleged judgment, and attested as an abstract, although attested by the clerk of the court in which the judgment was rendered, cannot ordinarily be read as proof of the alleged judgment, where the existence of the judgment is denied.

4. Where a judgment or decree is obtained for a debt, in a proceeding in chancery to enforce the lien of such judgment or decree against lands, ordinarily, it is not necessary that a complete copy of the whole record of the case in the court in which the judgment or decree was had, should be produced or filed, but only a properly authenticated copy of such judgment or decree.

5. In such case a copy of the judgment is an extract from the record of the cause, and not a complete copy of the whole record, and being an extract from the record, and a copy of the judgment, as entered, it may be read as evidence in the cause.

6. In such case where the fact to be shown is merely that a decree or

judgment has been rendered proof of the other proceedings ordinarily, (though perhaps not universally,) will not be necessary, but the adversary party will beat liberty to show any other matter in the record which may avoid the effect of that which is introduced.

1874.
January Term.

Dickinson
v.
Railroad Co.

7. An authenticated copy from the Recorder's docket of an official abstract of a judgment docketed under the provisions of the 3rd and 4th sections of chapter 139 of the code of 1868, of West Virginia, is evidence that such abstract was docketed, and when, and of notice to purchasers of lands upon which the alledged judgment is claimed to be a lien, when the existence of such judgment is properly proved; but where the judgment is put in issue, ordinarily, an authenticated copy of such abstract, as docketed by the Recorder, will not be received as proof of the judgment and dispense with the necessity of producing a properly authenticated *copy* of the judgment.

8. Section 5 of chapter 130 of the code of 1868 of West Virginia, applies as well to the records of the District Court of the United States, held within this State, as to the records of the courts of this State; and a copy of a judgment rendered in the District Court of the United States, in this State, attested by the clerk of such Court, according to the provisions of said last named section and chapter will ordinarily be received as evidence of the existence of such judgment.

9. The 19th section of chapter 130 of the Code of 1868, of West Virginia, does not apply to the records and judicial proceedings of the District Court of the United States, held within this State,

10. Where the contract for the purchase of land, by the Chesapeake and Ohio Railroad Company, provides that the purchase money is to be "paid in eight per cent preferred stock of the Chesapeake and Ohio Railroad Company;" and the court in decreeing execution of the contract decrees that the company issue and deliver in payment of the purchase money, its stock *guaranteed to pay eight per cent thereon*, IT IS ERROR.

11. In a suit in equity, to sell land to satisfy a judgment lien, or to enforce the payment of the purchase money, if it appears that there is a prior lien for unpaid purchase money on the land, those entitled to the benefit of such prior purchase money lien, should be made parties to the suit.

12. Three persons are chosen by the vendor and vendee of land to ascertain and fix the value of the land and to certify such valuation; in such case the certificate of valuation cannot be considered as more solemn, conclusive or binding upon the parties than an award—it is but an award, and the referees, or persons chosen, cannot, upon principle, be considered otherwise than as arbitrators.

13. It is, ordinarily, in equity, though, perhaps, not universally, misconduct in arbitrators chosen out of court to determine and award as to the matter or matters referred to them, in the absence of either party in interest to the submission, his agent or attorney, without notice being previously given to such absent party, his agent, or attorney, of the time and place of their proceeding to hear and determine the matter submitted, unless such absent party, not having notice, has dispensed with or waived such notice, or the like; and for such misconduct a court of equity may, ordinarily, set aside the award, at the instance of either party materially interested, not having such notice, and who was absent.

14. An award procured by the fraud and imposition of one of the parties to the submission, will be set aside for that cause, by a court of equity, in a proper case.

15. Though the simple fact that one of the parties to the submission wrote the award, in the absence of the other, who was not notified of the time and places of the arbitrators proceeding to make their award, may not, of itself, be sufficient to invalidate the award, still it may be considered, unexplained, as affording just ground for suspicion and criticism. But where such party, in such case, wrote the award, and so wrote it that it is materially erroneous and deceptive, in his favor, and the arbitrators did sign it, as written, a court of equity may set aside the award.

16. When the value of property in money is referred to arbitrators and they fairly execute the submission, generally, the award cannot be set aside or determined to be invalid upon the ground that the valuation is exorbitant.

17. Where a party intentionally or by design, misrepresents a material fact, or produces a false impression, in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage of him, in such case, there is a positive fraud. And the misrepresentation may be as well by deeds or acts, as by words; by artifices to mislead as well as by positive assertions.

18. If a party, for a fraudulent purpose, states a fact which is untrue, and without knowing it to be true, and he does not, at the time, believe it to be true, this is both a legal and a moral fraud. And where the representation, expressly or impliedly, forms a part of the contract between parties, it is not essential, in order to invalidate the contract, that there should have been a moral fraud.

19. If, upon a sale, the vendor makes material representations of matters of fact, as of his own knowledge, and they are in fact untrue, and the vendee is deceived thereby, the sale will be voidable, although the vendor did not know whether they were true or not.

20. Generally, though perhaps not universally, a cross-bill is considered as a defence to the original bill, or a proceeding necessary to a complete determination of a matter already in litigation.*

An appeal from a decree of the circuit court of Greenbrier county. The facts are stated, at length, in the opinion of the Court.

The Hon. Joseph M. McWhorter, judge of said circuit court, presided at the rendition of the decree below.

*John B. Baldwin*, of Virginia, and *Robert F. Dennis*, for the appellant.

*Samuel Price*, for the appellee Dickinson, the complainant below.

*John W. Harris* and *Adam C. Snyder*, for Rucker and others, appellees.

---

*The following are sections five and nineteen of chapter one hundred and thirty; sections three and four of chapter one hundred and thirty-nine, and section thirty-six of chapter one hundred and twenty-five, of the Code, referred to in the opinion of the Court.

"36. Every material allegation of the bill not controverted by an answer, and every material allegation of new matter in the answer constituting a claim for affirmative relief, not controverted by a reply, shall, for the purposes of the suit, be taken as true, and no proof thereof shall be required. "

"5. A copy of any record or paper in the clerk's office of any court, or in the recorder's office of any county, or in the office of the secretary of the state, treasurer, or auditor, or in the office of surveyor of lands of any county, attested by the officer in whose office the same is, may be admitted as evidence in lieu of the original. The certificate of the auditor of the fact and time of the return of any real estate as delinquent. or of the sale thereof for taxes, shall be *prima facie* evidence of what is stated in such certificate. Any such copy or certificate purporting to be sealed, or signed and sealed, or signed alone, by any such officer, may be admitted as evidence without any proof of the seal or signature, or of the official character of the person whose name is signed to it. The certificate of the auditor of the payment or non-payment at any time of taxes on forfeited or delinquent lands or of their not having been entered on the books of the assessor of the county or counties wherein the same were chargeable with taxes, shall, in any suit in relation to such lands, be *prima facie* evidence of what is stated in such certificate, provided it be filed with the papers of said suit, and notice thereof be given to the opposite party or his attorney, at least twenty days before the first day of the term at.

HAYMOND, PRESIDENT:

Dickinson
v.
Railroad Co.
Dickinson, the complainant, filed his bill in 1870, against William P. Rucker, and the Chesapeake and Ohio Railroad Company, in the circuit court of the county of Greenbrier, in which he alleges that at the November term, 1869, of the district court of the United States, held at Kanawha Court House, in this State, he recovered a judgment against Rucker, now of Greenbrier county, for $1,717.38, with interest as stated in the bill, subject to a small credit, and the costs of the suit. He professes to file with his bill, a copy of the judgment marked No. 1; that upon the judgment execution issued, and was returned by the Marshal *nulla bona*, and the whole remains unpaid; that at the time of the judgment, Rucker was the legal owner of various tracts of land in the Bend of Gauley river, Nicholas county, on which he then resided, all adjoining each other, and

which it is to be offered as evidence. When the certificate purports to be signed by the said auditor, it may be admitted as evidence without proof of his signature."

"19. The records and judicial proceedings of any court of the United States, or of any state, attested by the clerk thereof, with the seal of the court annexed, if there be a seal, and certified by the judge, chief justice, or presiding magistrate of such court, to be attested in due form, shall have such faith and credit given to them in every court within this state, as they have in the courts of the state, territory, or district whence the said records come."

"3, In the following section the word "judgment" shall include any undertaking, bond, or recognizance which has the force of a judgment.

"4. The recorder of every county shall keep in his office, in a well bound book, a judgment docketed, in which he shall docket without delay any judgment in this state, when he shall be required to do so by any person interested, on such person's delivering him an authenticated abstract of it. In such docket there shall be stated, in separate columns:

1. The names of the parties;
2. The amount of the judgment;
3. The value of specific property, (if any), recovered by it;
4. The date of the judgment;
5. The court in which it was rendered;
6. The date of docketing it.

And it shall be the duty of the clerk of the court in which, or of the justice before whom, any judgment is rendered to include in the abstract thereof the foregoing particulars. Every judgment shall, as soon as it is docketed, be indexed in the name of each defendant therein. If a recorder fail to do anything required of him by this section, he shall pay a fine of not less than thirty nor more than three hundred dollars to any person who will prosecute therefor."

1874.
January Term.

Dickinson
v.
Railroad Co.

constituting one large tract of about one thousand and six hundred acres, or more; that he had made some executory contract with the Railroad Company, by which he was to have the stocks of the Company in exchange for the lands, to a large amount, but whether the contract is ever to be executed or not he (Dickinson) cannot tell; that Rucker held two other tracts of land in the same situation, one in Nicholas, and the other in Clay county; that before the judgment and execution, Rucker had settled all his personal property upon his wife; that the judgment bound all of Rucker's realty, and the execution his personalty, including his choses in action, so that if the contract with the Railroad Company was valid. the execution was a lien on the stocks, and if not, the judgment was a lien on the lands, either of which would be sufficient to pay the debt; that Rucker is still the owner of a lot in the town of Summersville, Nicholas, county, on which the old "Kelly's," tavern stood, and also of a house and lot in Greenbrier, where he now resides, which are also liable to the judgment; that Dickinson is not anxious to interfere with the contract of Rucker and the Railroad Company. He, however, desires to reach, either the lands or the stocks and to have the question settled between Rucker and the Railroad Company, as to whether the contract between them is valid or not, and if he is to go against the stocks, he desires to enforce his execution lien against them in the hands of the Company. And he prays that the lands may be sold, it the sale to the Company is not valid and binding, to pay his debt, &c.; and if valid and binding that the stocks may be issued, and sold to pay the debt, &c. The bill also contains a prayer for general relief.

Rucker, in his answer, says, that at the date of the judgment rendered against him, in the bill mentioned, he was not, nor is he now, either the legal or equitable owner, of the lands in the bill referred to, nor is he entitled to any of the proceeds arising from the sale thereof; that on the 20th of June, 1868, he entered into a

written contract with the Chesapeake and Ohio Railroad Company, through J. A. Alderson, their authorized agent, for the sale of the lands first mentioned in the bill, as lying in Nicholas and Clay counties, and, that it was therein stipulated and agreed, that the stock to be issued in consideration thereof, should be issued to Cyrus P. Bryan, as trustee, for Margaret A., the wife of Rucker; that a deed conveying the lands, in pursuance of the agreement, was long before the date of the judgment, executed and delivered, by Rucker, to the vendees, and was duly admitted to record on the ——— day of October, 1868, in the Recorder's office of the counties where the lands lie; that by the contract and deed, he, (Rucker,) intended to, and did, transfer and convey, for the benefit of his wife, the entire proceeds arising from the sale of the land; that this was done for "valuable, and a and good valuable consideration, and, if it had been only upon the latter, it was at a time when he had other real and personal estate, amply sufficient to discharge both his present and prospective indebtedness;" that the transaction was perfectly fair, and wholly without fraud, actual or constructive. He denies that he is the owner of a lot in Summersville, but says the lot was for a valuable consideration, in the year 1868, conveyed by him to Isaac Miller, by deed, of record in Nicholas county. He also denies that he is the owner of a house and lot in Greenbrier; but states, the house and lot were purchased by his wife, paid for out of her separate estate, and that the deed was made to her. He admits that he has no personal estate in this State; all that he had was long since conveyed by him, for valuable consideration, to Cyrus P. Bryan, for the benefit of his wife. By a general clause, he denies all the allegations of the bill, not admitted or denied in the answer. He files with his answer copies of the contract and deed to the railroad company.

In May, 1871, Dickinson filed an amended bill in the cause, and made Rucker, and his wife Margaret, Cyrus

P. Bryan, and the Chesapeake and Ohio Railroad Company defendants thereto. In the amended bill it is alledged, that the land embraced in the contract of the 20th of June, 1868, made between Rucker and the Railroad Company, was, at the date of the contract, the property of Rucker, and that the debt due Dickinson from Rucker was contracted prior to the date of the contract; that the house and lot, near Lewisburg, where Rucker resides, purchased of Hoover and wife and her trustee, and embraced in the deed from Hoover and wife and trustee to Rucker's wife and filed with Rucker's answer, were really purchased and paid for by Rucker; that on the day of —— Rucker, by deed, conveyed to Bryan all his personal estate of great value, in trust to hold for the benefit of Rucker's wife, and the deed of conveyance is duly recorded in Greenbrier county; that Rucker has thus, in form divested himself of all property, real and personal, and settled the same upon his wife, to the prejudice of his creditors; that the deeds and contracts were voluntary, fraudulent and void, as to creditors; that the contract with the Railroad Company not having been recorded, so far as it attempts to convey the stock to Bryan, for the benefit of Mrs. Rucker, is, for that reason, void; that the Railroad Company, by the contract, bound themselves to deliver, a large amount of 8 per cent. preferred stock to Bryan, for Mrs. Rucker, within 3 months from the 20th of June, 1868, and the stock has not been so delivered, nor has it been delivered to any one, though long since due. And the bill charges that the stock is liable to Dickinson's execution, and can be arrested, and sold for the payment of his debt; and that the Hoover property is liable, as well as the personal property conveyed in trust to Bryan. The bill prays that the Railroad Company be required to issue the stocks and and place the same in the hands of a receiver of the court to be sold to pay the debt; that the house and lot, and the other personal property be sold for the same purpose; that all of said deeds, and contracts may

1874.
January Term.

Dickinson
v.
Railroad Co.

set aside, and declared void, and, that such other and general relief be granted as comports with equity.

On the 25th day of November, 1871, the Chesapeake and Ohio Railroad Company filed its answer to the original and amended bills. The early part of the answer contains a general demurrer to the bill and amended bill. In the answer the Railroad Company substantially states, and alleges, that it has no knowledge of the property or business of Rucker, or of any of the arrangements, or dispositions alleged to have been made by him in respect to the conveyance or settlement thereof, except as to the contract, and conveyance purporting to have been made by Rucker with it; that it knows nothing of the judgment claimed by Dickinson against Rucker, or if its consideration or validity or of the steps taken, or proceedings had for its inforcement; that so for as any of the allegations of the bills are relied upon to affect its rights or interests or as the foundation of any decree in the cause, it controverts them all, and calls for proof of each allegation, except so far as the same is expressly admitted to be true; that it admits that a contract was made between Rucker and it, dated June 20, 1868, a copy of which is filed with Rucker's answer to the original bill; that it knows nothing of the motives or purposes of Rucker, as affecting the rights of his creditors, in the making of the contract; nor does it know anything of the consideration upon which the issue of the stock, provided for by the contract, was directed to be made to Bryan, in trust for Rucker's wife; that if it has been made a party to a contract, having for its purpose a fraud upon creditors, it was done without any knowledge on its part of such purpose; that it has thus far declined to carry into effect the contract of June 20, 1868, having been engaged in investigations in relation to the revoking of the same—the valuation purporting to have been made under it, the survey alleged to have been made for ascertaining the quantity of land, and the title of Rucker to the lands; that pending the investi-

gation negotiations have been going on between it and Rucker looking to a recission of the contract upon terms satisfactory to the parties; that the negotiations have failed; that it is unwilling, specifically, to execute the contract, for the following reasons: The contract embraces three tracts of land—that the Bend of Gauley tract is described in the contract as "containing two thousand acres, more or less, the exact number of acres to be ascertained by the county surveyor at the earliest day practicable, and certified by him on the back of this agreement;" that J. Haymond Robinson, surveyor of Nicholas county, certifies in an indorsement upon the contract that by calculation he finds the Bend of Gauley farm in the within contract to contain one thousand eight hundred and sixty-six acres of land, including one half the width of Gauley river, from a water birch on the bank of the same, a distance of eight hundred and sixty poles, allowing the half width of the river to be eight poles;" that the ascertainment of the amount of acres is not based upon actual survey, but on calculation in lieu thereof, and is incorrect, and if the contract is to be executed at all it insists, that the true quantity of the land shall be ascertained by actual and correct survey, and that it shall have fair notice of the making of the survey, a privilege not extended to it by the surveyor in his operations; that the contract of June 20, 1868, provides for a sale of the "Bend of Gauley," "at so much per acre as may be determined by Messrs. George Brown, Samuel T. Grose and Joseph Copenhaver, being disinterested and responsible landowners, in the said county; the price per acre, so determined, to be certified by them, on the back of this agreement;" that Brown, Grose and Copenhaver, professing to act under this provision, on the 6th of July, 1868, certified on the back of the agreement "that having carefully examined Dr. Wm. P. Rucker's Bend of Gauley plantation, in accordance with the provisions of the within agreement, referring the matter to us, hereby certify that the said tract is worth

$16.50 per acre ;" that it had no notice of the time and place of making the examination and valuation, and does not know who was present at it, or upon what representation, as to boundary or quantity, or what evidence as to the value, the valuers acted, and is advised that no such valuation can affect its rights ; that by the assessment of lands for taxation in Nicholas county in the year 1866, the assessment made last preceding the valuation, the "Bend of Gauley" tract, composed of eight several parcels, is assessed at an average of less than $3.60 per acre, the highest value placed upon any parcel being $5.65 per acre ; that this discrepancy is so great as irresistibly to raise the suspicion, if not the conclusion, of some great misrepresentation, mistake or fraud; that at the date of the valuation and its endorsement on the back of agreement, there had been no ascertainment of quantity by a calculation, including not only the inaccessible cliffs of Gauley, but one half the bed of the stream ; that it is unwilling to stand to this valuation without having an opportunity to subject it to the tests of a most thorough and rigorous investigation ; that the contract declares as to all the lands included in it, "the titles to these tracts of land are all clear, and in no way encumbered, except there are some $300 due, back money, on the Bend of Gauley plantation, which will be settled immediately ;" that there are several outstanding liens for purchase money upon different parcels of the "Bend of Gauley," in addition to the $300 referred to, and which has not been settled as promised by the contract; that there are defects of title, of form and substance, affecting several of the parcels constituting the Bend of Gauley ; that as to one small tract Rucker owns only an undivided interest, and as to two others, and larger tracts, there is an outstanding dower right held by the wife of a vendor; that these, and other defects of title, show the necessity of requiring from Rucker an exhibit and abstract of title, and a removal of such defects before allowing him, or any one for him, to have

specific performance of the contract; that in addition to these matters, in the description of the "Bend of Gauley," as to its condition of clearing, cultivation, and improvements, there was practised, by Rucker, the grossest deception and fraud; that he exceeded the license allowed to the most excited vendor, and the puffing or commendation of his property tolerated by the law, in consideration of human infirmity, and resorted to misstatements of fact so glaring as to mark the whole transaction with fraud, such as a court of equity cannot tolerate; that the title of the two hundred and fifty acre tract, in Nicholas, is subject to the outstanding dower right of a former proprietor; that this land was sold to it in the description of Rucker at $3 per acre; but it is in fact utterly without value; that the one hundred and seventy-five acre tract in Clay county has been sold for taxes which were assessed, and in arrear, before the contract of June 20, 1868; that the price at which this tract was sold, upon the representation and description of Rucker is $11 per acre, and it is not worth one-fifth of that amount; that it has learned that Rucker and wife have undertaken to make, and have placed on record a conveyance of these several tracts of land to it, a copy of which is filed with Rucker's answer; that from the copy it appears that, though recorded, the deed was never delivered to it, but was delivered to J. A. Hamilton, merely as an escrow; that it never accepted the conveyance, and is unwilling to accept it, and in fact the deed was never offered to it; that the whole transaction connected with the contract of June 20, 1868, is one which, in all its features, is marked by fraudulent misrepresentation, to the prejudice of its rights, and that it resists the performance of the contract upon all the grounds stated, and upon all other grounds that may be disclosed upon the most thorough investigation; that it is advised that the litigation of all these matters cannot be properly conducted in this suit, where the parties really litigant

are all defendants, and where these matters are not, and cannot be, regularly put in issue; that it controverts all the allegations in the bills, not admitted by its answer to be true, and denies all fraud.

Rucker, in his answer to the amended bill refers to his answer to the original bill, and prays that it may be read as part of this answer. And he alleges that the deed of trust to Bryan of the 18th of December, 1868, was a fair and *bona fide* transaction ; that the conveyance was made not only upon a valuable consideration, but also for an adequate consideration, and that the entire property, therein embraced, has long since been sold by the said trustee, and the proceeds applied to the payment of the claims of the creditors therein, and thereby, secured, and that all these transactions were had, and made, long before the recovery of Dickinson's judgment; that the settlement made upon his wife, in the contract with the Chesapeake and Ohio Railroad Company, was in consideration of a debt of some $4,750, morally and legally due from him to his wife ; and in the further consideration that she would relinquish her dower right and interest in the lands sold by him to the Company, as appears by a contract or deed entered into with his wife, and her trustee, Bryan, on the 27th of May, 1868, a copy of which is filed with the answer as exhibit (A.) ; that his wife, in consideration of the settlement, did, afterwards, relinquish her dower interest in the lands ; that he denies that he bought or paid for the house and lot conveyed by Hoover and others, to his wife, except as agent only of his wife, and with her property and funds. He denies that any of the contracts and deeds referred to in the bills are voluntary or fraudulent. He denies that the contract with the Railroad Company is void for want of recordation, or for any other reason, and he, by way of conclusion, denies all of the allegations of law or fact, in complainant's bill contained, not before denied.

Mrs. Rucker and Bryan failed to answer the amended bill.

Rucker does not deny the allegation in the amended bill that Dickinson's debt was contracted prior to the 20th of June, 1868; nor does he deny the allegations in the bills, as to obtaining the judgment for the amount alleged, and at the date alleged, and the issuing of execution upon the judgment, and the return by the Marshal, of "no property found;" nor does he deny the allegation that he has divested himself of all property, real and personal, and settled, or had the same settled, upon his wife. The alleged copy of the judgment filed by Dickinson, and filed as exhibit No. 1, is as follows: "At a District Court of the United States, for the District of West Virginia, held at Charleston, the 29th day of November, 1869. Russell J. Dickinson vs. William P. Rucker, debt: Judgment for plaintiff for seventeen hundred and seventeen dollars, thirty-eight cents, with legal interest on seventeen hundred dollars, part thereof, from the first day of January, 1861, and like interest on $17.38, the residue thereof, from the 29th day of November, 1869, until paid, and $34.30, costs of suit. But this judgment is subject to a credit of $62, paid the 22d day of October, 1860. A true abstract from the record. Teste: Jasper Y. Moore, Cl'k U. S. C't., D., W. Va." Upon this alleged copy, the counsel for the Railroad Company endorsed an exception on the 5th December, 1871, in these words: "This paper is excepted to by the Chesapeake and Ohio Railroad Company, as not being legal and sufficient evidence of the plaintiff's judgment vs. Rucker." Immediately below the certificate of acknowledgment of the alleged deed from Rucker and wife to the Railroad Company, and upon the deed is this writing: "I delivered this to John A. Hamilton, as an escrow, to deliver to the Chesapeake and Ohio Railroad, as my deed, upon condition, that said Company first pay you, as per contract between myself and said Company, bearing date June 20th, 1868, September 18, 1868." Signed: "William P. Rucker."

It appears, from the certificates of the Recorders of

1874.
January Term.

Dickinson
v.
Railroad Co.

Nicholas and Clay counties, that the deed was admitted to record in Nicholas county, November 9, 1868, and in Clay county, November 25, 1868. On the 11th day of December, 1871, and before any parol evidence was taken in the cause, the court made this decree, to-wit: This cause came on this 11th day of December, 1871, to be heard upon the bill, amended bill, answers of the defendants, Wm. P. Rucker and the Chesapeake and Ohio Railroad Company, and an appearance by counsel, for the other defendants, without answer and service of subpœna on said defendants, against whom the bills are taken for confessed, replications to said answers, exhibits, exception to the plaintiff's exhibit No. 1, and arguments of counsel; upon consideration whereof, it appears to the court, that by virtue of the judgment and execution referred to in the bill, the plaintiff has a lien upon either the lands conveyed to the said Railroad Company, by the defendant Rucker, or upon the stocks to be issued by said Company, in consideration of said lands. But said Company having filed an answer, contesting the validity of said contract, which, in the opinion of the court, renders it proper for the said Company to file a bill for relief against said contract, so that the same may be set aside or affirmed, according to circumstances; it is therefore, adjudged, ordered and decreed, that said cause be continued, with leave to said Company to file a cross bill, praying a recission of said contract; and, unless the same be filed in a reasonable time, and prosecuted with diligence, the court will proceed to render a decree enforcing said contract.

The Railroad Company, in pursuance of said decree, filed its cross-bill in the cause, against Dickinson, Rucker and wife, and Bryan, in which the main part of the decree is recited. In the cross-bill it is alleged by the Railroad Company, that it was formed by and organized under a contract made August 31, 1868, between commissioners of Virginia and West Virginia, with the Virginia Central Railroad Company, which

contract was ratified and confirmed by an act of the Legislature of West Virginia, entitled, "An act confirming and amending the charter of the Chesapeake and Ohio Railroad Company," passed January 26, 1876.—(Acts of 1870, p. 5.); that before the making of the final contract, to-wit: on the 24th of May, 1867, and 30th November, 1867, preliminary contracts had been made between the same parties, having the same general design, but subject to conditions which rendered them imperative; that upon the faith of these preliminary contracts, and in anticipation of the final contract of August 31, 1868, the Virginia Central Railroad Company went on, under one of the provisions of the charter of the Chesapeake and Ohio Railroad Company, to receive subscriptions to a preferred eight per cent. stock, payable in lands. The business of receiving the subscriptions, and of contracting for lands in payment therefor, was entrusted to a general agent, and to sub-agents selected and paid by him. One of these sub-agents, J. A. Alderson, on the 20th day of June, 1868, made with Rucker the contract referred to in the original bill; that the validity of this contract is contested for the reasons afterwards stated; that no part of the contract has at any time been specifically performed, and it claims that under the circumstances, it is entitled to occupy the position of one who resists a recission of a contract. The cross-bill then proceeds to make allegations and averments about the same as contained in the Company's answer, in relation to the contract of the 20th June, 1868, and the proceedings of the valuers and surveyor, had, and made, thereunder, and the alleged deed, except that in some respects it is more specific, and concludes thus: "Complainant charges, and expects to prove, that the whole transaction connected with this contract, is one marked on all its features by fraudulent misrepresentations and deception, to the prejudice of complainant's rights, and complainant will, upon such proof, ask that the said contract may be wholly rescinded, and set aside,

and that upon a full hearing of the whole matter, such other and further relief may be granted to complainant, as may consist with equity, &c."

To the cross-bill, Dickinson, Mrs. Rucker, Bryan, and Rucker filed their separate answers. Dickinson, in his answer, says he knows nothing of the fraud, misrepresentations or mistakes referred to in the cross-bill, which are alleged to have been used to procure the contract between the Railroad Company and Rucker, and he calls for proof, and he says he can neither confess nor deny the same.

Mrs. Rucker, in her answer, is brief, and says she admits the contract of 20th of the June, 1868, between the Company and her husband. She denies all fraud and collusion in the procurement of the contract, and insists that the Company should be held to a full compliance with its engagement.

Bryan, in his answer, also admits the contract, and avers that there is no ground for its recission, and in other respects is about the same as that of Mrs. Rucker.

Rucker, in his answer, admits the contract entered into by him and the Company, through J. A. Alderson, its duly authorized agent, and avers that he has substantially complied with its terms. He says it is true the surveyor reports that he has found, "by calculation," that the "Bend of Gauley" contains one thousand eight hundred and sixty-six acres; but, as he was informed, the calculation was not a mere speculative one as plaintiff assumes, but a calculation based upon an actual survey, made by the surveyor, and one which, if incorrect, falls short of the quantity the farm contains; that he is informed and charges that, since the sale actual and survey has been made of the "Bend of Gauley," farm by an engineer of the Company, employed for the purpose by the Company, and that his report shows no deficiency, whatever; that the contract does not stipulate that the surveyor should

give notice of the time at which he would make the survey, and that it was not incumbent on him, or any other person, to do so ; that the surveyor was the mutual agent of the Company and him for the performance of the work, and acted as such ; that he, Rucker, was not present, or notified to be present, at the survey ; that the contract contains no provision for notice of the time and place of the assessment of Messrs. Brown, Grose and Copenhaver ; that they were the mutual agents of both parties, and made the valuation at a time when he was not present pursuant to a joint note addressed them by Alderson and himself, informing them of their selection, and requesting them to go upon the land and value it pursuant to the contract, a copy of which was furnished them for the purpose. He denies all collusion with the valuers, and alleges that the land is worth quite as much as they put it at, and that other lands adjoining, of no better quality, are held at a much higher figure in cash ; that so far as the state assessment is concerned, it is notorious that this is invariably below the value of the lands assessed ; that as to the incumbrance on the land, plaintiff was fully informed before entering into the contract, which provides for its payment ; that he has paid this off with the exception of about $160.50, with two years' interest thereon, and that but for the bad faith of plaintiff in repudiating a fair and *bona fide* engagement, he would have long since been able to discharge the whole. He admits that has but an undivided interest in twenty-five acres of this farm, a fact which was overlooked at the time, and agrees to a proper abatement for this insignificant defect. He denies that there is an outstanding dower right on two other tracts, but admits that the tracts bought of D. R. Hamilton, containing five hundred and sixteen acres, are subject to a contingent right of dower by Hamilton's wife dependent upon her surviving him ; that this contingency may never happen, and may be provided for by allowing the Company to retain stock sufficient to cover it until the question is deter-

mined; that this land is unimproved and of much less value than the residue of the tract. He denies all fraud in the description of the "Bend of Gauley" farm, and avers that its condition at the date of the contract was as represented therein, substantially; moreover, the agent of the Company, when entering into the contract, was thoroughly conversant with its condition, and the representations were no inducement thereto. He claims that there is no outstanding dower right upon the two hundred and fifty acres in Nicholas, and believes it well worth the price agreed to be paid therefor. He also says that it is doubtless true, that the one hundred and seventy-five acre tract in Clay county has been sold for taxes, but whether the taxes accrued before or after the purchase by complainant, he does not know; that it was not sold until after plaintiff's purchase, and no deed was made to the purchaser at the tax sale for about two years after complainant was given possession. He claims that this loss must fall on plaintiff; but if otherwise, it is ground only for compensation or abatement, and not for a recission of the entire contract. He believes this tract to be fully worth the price to be paid, and the agent of the Company was far more familiar with its value than he. He claims that the deed from him and wife to plaintiff was never delivered to the Company or accepted by it; but says it is true that the deed was in the first instance delivered to take effect when the Company should comply with its part of the contract; and afterwards, on the 9th day of November, 1868, at the solicitation of the general agent of the Company for land subscriptions, and of John A. Hamilton, and of its sub-agents, at a time when the Company was desirous of perfecting all contracts for land subscriptions in order to complete its organization, and secure the privileges extended by the legislatures of the two Virginias, he made an absolute, final and unqualified delivery of the deed to Hamilton, who was duly authorized to receive the same; who thereupon, on behalf of the Company, had it recorded in the

conuties of Nicholas and Clay. He also says the contract was ratified and the deed accepted by the Company, and the stock agreed to be furnished under the contract has ever since been represented in the general meeting of the stockholders of the Company. He denies all collusion, fraud and misrepresentation, and all the allegations of the cross-bill not admitted, and avers that he has complied with his engagements substantially, and that the Company should be held to a full performance of its engagements, in the premises.

On the 26th of April, 1872, the causes were heard together, the original cause upon the papers formerly read, and the cross-bill cause upon the bill, answers of the defendants thereto, replications to the answers, exhibits, depositions, &c: And the court decreed that the application for a recission of the contract, upon the ground of fraud, be rejected and disallowed, and the prayer of the cross-bill, as to that ground, be dismissed. The court in its decree further provided, "And it appearing to the court that these lands were sold by the acre, and not by the tract, which renders it material that before final decree is rendered the quantity thereof, should be accurately ascertained, by a competent surveyor, the one party contending that the several tracts of land in the "Bend of Gauley" constitute a tract of 1,866 acres, and the other party that said tracts contain only $1,379\frac{1}{2}$ acres or $1,293\frac{1}{2}$ acres, the court is therefore of opinion that until an accurate survey is made the smallest quantity may be safely adopted by the court, not, however, to the prejudice of either party, when the quantity is accurately ascertained; and it appearing that when the 250 acres are added to the above quantity of $1,293\frac{1}{2}$ acres they make an aggregate quantity of $1,543\frac{1}{2}$ acres, and the said $1,293\frac{1}{2}$ acres having been sold at the price of $16.50 cents per acre, and the tract of 250 acres at $3.00 per acre they make an aggregate sum of $22,093, for which the defendant Rucker, his assignee or creditors, are en-

52

titled to have issued stocks by the Railroad Company, to pay at least eight per cent, so soon as the road of the said Company is finished to the Ohio River; which stock, so far as necessary, is liable to the lien of the judgment of the plaintiff, Dickinson, after first applying so much as may be necessary to pay off the lien of $169.-50 with its interest, due to Andrew F. Foster, balance on the 150 acres of land conveyed by him to the defendant Rucker: It is, therefore, adjudged, ordered and decreed that the said Chesapeake and Ohio Railroad Company do forthwith issue the sum of $22.093, guaranteed to pay eight per cent. thereon, so soon as the said road is in running order through to the Ohio River, to the said Wm. P. Rucker, and place the same in the hands of Samuel Price, commissioner appointed by this court to receive the same, with directions to sell, or have sold, for cash, so much thereof, in the Richmond market, as will pay the debt due the plaintiff, Dickinson, amounting to $2,879.66, with interest from the 26th of April, 1372, until paid, and the cost of suit, and the debt of Foster, as aforesaid, &c." The commissioner was directed to hold the residue of the stock in hand, subject to the orders and decrees of the court. The court in this decree appointed a special surveyor to ascertain, by actual survey, the quantity of acres in the "Bend of Gauley" tracts and report the same to the court. The court also appointed a special commissioner to ascertain, *first*, whether the 3000 rails mentioned in the contract have been made and put up in fence, if not, the extent of the failure, and the amount which can properly be charged therefor; *Second*, whether the taxes were all paid by the said Rucker, upon the tract of 175 acres of land properly chargeable to him to the date of the sale, and if not, the amount which he omitted to pay, and the effect of the failure upon the title of said land now in the hands of the Railroad Company. Upon the rendition of this decree the Railroad Company appealed, and it is now for this Court to determine what errors, if any, were

committed by the circuit court, and what should be done in the causes.

*First.* It is insisted by the appellant, that exhibit No. one, filed with the original bill, is not legal or proper evidence ot the alleged judgment, as against it; and the judgment and debt in the original and amended bills mentioned, being controverted by its answer, that it was error in the circuit court, in the absence of other sufficient proof of the alleged judgment, to decree against it the execution of the contract.

It is true there is no evidence or proof of the alleged judgment or debt against Rucker taken or filed in the cause except exhibit No. one, which I have given in full. Rucker in his answers does not deny the existence of the debt and judgment, as alleged in the original and amended bills, and they are taken for confessed, as to Mrs. Rucker and Bryan. Although it is provided by chapter one hundred and twenty-five, section thirty-six of the Code of this State, that "every material allegation of the bill, not controverted by answer, shall, for the purposes of the suit, be taken as true, and no proof thereof shall be required," the allegations in Dickinson's bills, as to his debt, and judgment, must be taken as true, against Rucker, and the other defendants, who failed to controvert them; still, as the appellant, in its answer, does controvert the existence of the debt and judgment, the allegations in relation thereto cannot be taken as true against it, but must, in this case, he established by competent and proper evidence, especially as Dickinson's right to a decree in the cause against the appellant, under and by virtue of the contract, or for any cause, alleged in the bill, is controverted in the appellant's answer.

Green., on Ev., vol. 1, page 638, sec. 501 says: "As to proof of records, this is done either by the production of the records, without more, or by a copy. Copies of records are, (1) exemplifications; (2) copies made by an authorized officer; (3) sworn copies. Exemplifications,

are either *first,* under the great seal ; or *second,* under the seal of the particular court where the record remains. When a record is the gist of the issue, if it is not in the same court, it should be proved by an exemplification. * * But, in the United States, the great seal being usually, if not always, kept by the Secretary of State, a different course prevails; an exemplified copy, under the seal of the court, is usually admitted, even upon an issue of *nul tiel record,* as sufficient evidence. When the record is not the *gist* of the issue, the last mentioned kind of explification is always sufficient proof of the record at common law." By the Code of this State chapter one hundred and thirty, section five, it is provided that "a copy of any record or paper in the clerk's office of any court, or in the Recorder's office of any county, or in the office of the Secretary of the State, Treasurer, or Auditor, or in the office of Surveyor of Lands of any county, attested by the officer in whose office the same is, may be admitted as evidence in lieu of the original. Any such copy or certificate purporting to be sealed, or signed and sealed, or signed alone, by any such officer, may be admitted as evidence without any proof of the seal or signature, or of the official character of the person whose name is signed to it." This section, as is manifest from other sections of the same chapter, so far as it applies to records of courts, is applicable only to the records of courts within the State, and not to courts which are foreign. Exhibit No. one, is not under the seal of the District Court of the United States. Is it a copy of a judgment of that Court? Does it purport on its face to be a copy? If it is not a copy, and does not purport to be a copy, even though the attestation of the clerk of the District Court of the United States for the District of West Virginia were sufficient, without the seal of the court, it cannot be read as evidence or as proof of the judgment, as against the Railroad Company, under the section of the Code, above cited. A copy, is a true transcript of an original writing. 1 vol-

Bouvier's Law Dict. 363. An exemplification is a perfect copy of a record or office book, so far as relates to the matter in question. *Id.*, 362. Exhibit No. 1, is not in the form of judgments, as usually entered by courts of record—it does not purport to be a copy of a judgment, but only "a true abstract from the record," and is certified as as an abstract by the clerk, and not as a copy of the judgment. An abstract of a judgment or title is not the same as a copy of a judgment or title. An "abstract of a title" is a brief account of all the deeds upon which the title rests. A synopsis of the distinctive portions of the various instruments which constitute the muniments of title. See Preston on Abstracts of Title ; Wharton's Dict., 2d Lond. Ed.; Bouvier's Law Dict. 47. An abstract, ordinarily, means a mere brief and not a copy of that from which it is taken. This paper, then, being only an abstract of an alleged judgment, and attested only as an abstract, and not as a copy, and the existence of the judgment being denied, and the abstract, excepted to as not being legal evidence of the judgment, it cannot be read as proof of the judgment against the Railroad Company. It would be extremely dangerous to accept mere abstracts of judgments as proof of the original. I don't think it necessary that a complete copy of the whole record of the case in the District Court should be produced, but only a properly authenticated copy of the judgment. *White v. Clay*, 7 Leigh, 68, 78, 82 ; *Greene v. Harmon*, 5 Gratt., 157.

In the cases last cited it was *held*, that extracts from the record might be read as evidence in those cases, but the extracts were copies, of several separate orders and decrees, and not mere abstracts thereof; or, in other words, not the opinion of the clerk as to the substance or effect of the orders or decrees. If exhibit No. 1 was a copy of the judgment as entered, it would be an extract from the record of the cause, and not a complete copy of the whole record, and, being an extract from the

record, and a copy of the judgment, as entered therein, it would be evidence in this case under the ruling in the cases to which I have referred. I understand the court to have simply decided, in these cases, that it was not necessary to produce a complete copy of the whole record, but only to produce a copy or copies of so much of the record, as satisfactorily established the fact in question. Judge Tucker, in the case of *White v. Clay*, 7 Leigh, 82, says, "For, where the fact to be shown is merely that a decree has been made in the court of chancery, or that a decree made there has been reversed on appeal, proof of the other proceedings will not be necessary, but the adversary party will be at liberty to show any other matter in the record, which may avoid the effect of that which is introduced." The third and fourth sections of chapter one hundred and thirty-nine of the Code, provides for docketing judgments upon delivery to the Recorder, of authenticated abstracts thereof. The docketing of judgments, as provided for, is intended for a special purpose, and that is to enable persons who may desire to purchase lands, &c., in any county, to know at what place, and in what description of record book they can learn the fact as to whether there are judgment liens; or, in other words, it is intended as notice to purchasers, that they may be put upon intelligent inquiry. An authenticated copy, from the Recorder's docket, would be evidence as to where the abstract was docketed, and of notice to third persons of the existence of the judgment, when such judgment was properly proved; but would not, I apprehend, in a suit where the existence of the judgment was put in issue by the pleadings, be received, ordinarily, as proof of the judgment, and dispense with the necessity of producing an authenticated copy of the judgment itself. When the judgment, or an authenticated copy thereof, is produced, then an authenticated copy from the Recorder's docket is simply proof that an abstract of the judgment was docketed as, and at, the place, prescribed by law, to have its

legal effect touching the preservation of the judgment lien as against subsequent purchasers, &c. It has been argued, that if exhibit No. 1 purported to be a copy on its face, and was in fact a copy, and so attested by the clerk of the District Court of the United States, for the District of West Virginia, it could not be read as evidence, upon the ground that section five of chapter one hundred and thirty, already cited, does not embrace or apply, to records of the district or circuit courts of the United States, held in this State, but only to the records, &c., of the courts within this State, established by the Constitution and laws thereof—it not being authenticated according to the Act of Congress, or the nineteenth section of chapter one hundred and thirty of the Code of this State, and not having the seal of the court attached thereto.

The District Court of the United States, and also the Circuit Court thereof, held within this State, are in many respects domestic courts. These courts administer the laws of the United States in the several states; but they administer also the laws of each state, and follow, to a very great extent, the systems of judicature of each, in their respective districts; pursuing, in most cases, their practice, and deferring to their decisions; binding lands by their judgments, and issuing process to every part of their jurisdiction, without pretention, generally, of power to act upon the people or the territory, of another state. And in the execution of these duties, some are engaged in untangling the complicated system of land laws, altogether peculiar to one state; some look for the lights of legal science to the common law, while others draw their principles from the fountain of the Institutes, or the pages of the *Code Civile.* Opinion of Tucker, judge in *Draper's Exors. v. Gorman,* 8 Leigh.. 647. It is obvious, however, that the circuit or district courts of the United States, of Ohio or New York can not be considered as domestic courts in our State tribunals. Judge Tucker, in same case, on same page, says: "Admitting that the

judgments of the circuit court of Virginia are domestic, and should be so treated, there are reasons for it which, if not altogether satisfactory, are entitled to much consideration. That court administers *Virginia* law, in controversies between man and man; it follows *Virginia* practice, it defers to *Virginia* decisions, it decides facts by a *Virginia* jury; its judgments bind *Virginia* lands, its process pervades the state and its executions attach both the property and persons of our people. These are strong considerations; but the *commune vinculum* is wanting, the sovereigns are different, and the jurisdictions, upon principle, ought to be regarded as alien to each other. The nineteenth section of chapter one hundred and thirty of the Code does not apply to the records and judicial proceedings of United States Courts held within this State, but in other states, as is manifest, from the concluding clause, "shall have such faith and credit given them in every court within this State, as they have in the courts of the State, territory or district whence the said records came." If the fifth section of chapter one hundred thirty of the Code does not apply to the records and judicial proceedings of the district, and circuit courts of the United States, held within this State, then our State Legislature has failed to provide, by statute, any mode of authentication of the records and judicial proceedings of these courts to entitle them to be received and read as evidence in our State courts. If judge Tucker in the use of the word "alien," in speaking of the United States Courts, held in this State, and our State Courts, meant to assert that they were "foreign" in their jurisdiction, in all respects, I think he asserted more than is recognized by the judiciary and legal profession of this day. It is unquestionably true that courts of the United States, though held within this State, derive their existence and jurisdiction from the Constitution and laws of the United States, and not from the Constitution and laws of the State; still, in the exercise of their jurisdiction they administer the laws of the

State, their juries are citizens of the State, the offices of their clerks are within the State, and, so far as I am informed, the officers of the courts are citizens of the State. The judge of the district court is generally, if not always, a citizen of the State, and he is one of the judges who presides in the circuit court, and may alone, as he often does, hold that court. The judgments, or decrees of these courts, held within the State, have never, so far as I am advised, been treated and held by our State courts as foreign judgments. Our State courts recognize and enforce the liens of the judgments of these courts, when asked to do so. The judgments of foreign courts do not constitute liens upon lands within this State. A judgment rendered by a court in the state of Ohio is not a lien upon lands in this State. The jurisdiction of the circuit and district courts of the United States, held within this State, as a general rule, is local, does not extend beyond the limits of the State. There may be some exceptions to this rule, but if there are any, they are very few. In many cases, they exercise jurisdiction over the same subjects as our State courts, in actions real and personal, as well as in some cases of crime. So far as these courts derive their existence and jurisdiction from the Constitution and laws of the United States, they may be considered foreign, in a limited sense; but in the exercise of their jurisdiction in the administration of justice, they may be properly considered as domestic courts, according to my present convictions. Greenleaf in his first volume upon Evidence section four hundred and ninety, says: "The reciprocal relations between the national government and the several states are not foreign, but domestic. Hence the courts of the United States take judicial notice of all the public laws of the respective states, whenever they are called upon to consider and apply them. And, in like manner, the courts of the several states take judicial notice of all public acts of Congress." In the four hundred and eighty-ninth section of same

53

volume he says : "The relations of the United States to each other, in regard to all matters not surrendered to the general government by the national constitution, are those of foreign states in close friendship, each being sovereign and independent. Upon strict principles of evidence, therefore, the laws and public documents of one state can be proved in the courts of another, only as other foreign laws." There has been some relaxation of this rule, by the courts of many of the states, and the Supreme Court of the United States, as will be seen by same section. In section five hundred and four of same volume he says; "In regard to the several states composing the United States, it has already been seen, that though they are sovereign and independent, in all things not surrendered to the national government by the Constitution, and therefore, on general principles, are liable to be treated, by each other, in all other respects, as foreign states, yet their mutual relations are rather those of domestic independence, than of foreign alienation." (7 Cranch 481; 3 Wheat., 234.) "It is accordingly provided, in the Constitution of the United States that full faith and credit shall be given, in each state, to the public acts, records and judicial proceedings of every other state, and that Congress may, by general laws, prescribed the manner in which such acts, records and proceedings shall be proved, and the effect thereof." Under this provision Congress passed, upon this subject, the act of May 26, 1790, which is familiar to the legal profession. The fifth section of chapter one hundred and thirty-nine of the Code of this State provides that "every judgment for money, rendered in this State, heretofore or hereafter, against any person, shall be a lien on all the real estate of, or to, which such person shall be possessed or entitled, at, or after, the date of such judgment, or if it was rendered in court, at, or after, the commencement of the term at which it was so rendered, &c." And the eighth section of the same chapter provides that "the lien of a judgment may always be enforced in a court

of equity." Do not these sections apply as well to judg-
ments of the United States Courts held within this State, as to judgments of our State courts? I apprehend they do, and I think there is no difference of opinion upon this subject among members of the legal profession. And so of the fourth section of the same chapter, in relation to the docketing of judgments and the preservation of judgment liens. If these sections apply to judgments of the circuit and district courts of the United States, why may not the fifth section of chapter one hundred and thirty apply to the records and judicial proceedings of these courts? The language is equally broad—It is "a copy of any record or paper in the clerk's office of any court, may be admitted as evidence in lieu of the original, &c." My present conviction is that said fifth section does embrace the records and judicial proceedings of these courts. And that to entitle them to be received as evidence in our State courts it is only necessary that they should be authenticated in the same manner as said section requires the records and judicial proceedings of our own courts to be certified to entitled them to be received as evidence. Such, according to my understanding, has, heretofore, been the universal practice of our State courts, and that practice so far as I have learned has been sanctioned by the legal profession of the State. This objection of appellants must therefore be overruled.

*Second,* It is objected by the appellant that the decree of April 26th, 1872, is erroneous in directing the Railroad Company to issue $22.093 of its stock, guaranteed to pay eight per cent thereon, so soon as its railroad is in running order through to the Ohio River.

The contract specifies that the price of the land shall be paid in eight per cent preferred stock of the Chesapeake and Ohio Railroad Company, at its par value, and the Company is not thereby required to guarantee the payment of eight per cent thereon. This objection is well taken and must be sustained.

1874.
January Term.

Dickinson
v.
Railroad Co.

*Third,* It is objected that Andrew F. Foster should have been made a party to the original and amended bills, before the decree of the 27th of April 1872 was made, as there was, and is still, purchase money due him from Rucker, which is a lien upon 150 acres of the "Bend of Gauley" farm.

In the decree the court undertakes to ascertain the amount of purchase money due Foster and to provide for its payment out of the sale of the stock, and the amount, so ascertained, is less than the amount of purchase money stated to be in arrear in the contract. How the court ascertained that there was $169.50 due Foster, with its interest, from the evidence in the cause, I am unable to understand. Rucker says in his answer that he has paid off the purchase money incumbrance, mentioned in the contract, except $160.50, with two years interest thereon, but there is no evidence of this in the cause. The statement in the answer, under the circumstances, is not evidence or proof of the fact, and the answer does not even state to whom the amount is due. The party to whom the purchase money is in arrear, not being before the court, he is not bound by the decree. The amount of purchase money in arrear is controverted by the pleadings, and as it is clear that the appellant might be prejudiced and injured by the decree, in this respect this objection is well taken and must be sustained.

*Fourth.* It is further objected by the appellant that the contract was procured by fraudulent misrepresentation, and that the court erred in enforcing the valuation or award of Brown, Grose and Copenhaver, fixing the value per acre, of the "Bend of Gauley" farm, upon the ground of the fraud, and that the Company, or its agent, did not have notice of the time or place on, or at, which the valuers would proceed to ascertain the value per acre of this large tract, and was not present or represented at the valuation, though Rucker was, so far, at least, as to write the certificate or award of valuation. And also

upon the ground of false and fraudulent misrepresenta-tion to the valuers of the character and boundaries of the land, and the title thereto, as made by Rucker in the contract, upon which representations they were influenced and acted, to a great extent, in fixing the valuation. And also upon the grounds of fraud, mistake and other misconduct in the valuers or arbitrators, and of fraud and imposition of Rucker upon the valuers or arbitrators ; that the valuers, in fixing the value at $16.50 per acre did not agree upon that sum as the money value of the land, but as the value per acre in depreciated stock.

The contract recites, "That the said Wm. P. Rucker has this day sold to the said Chesapeake and Ohio Railroad Company the following tracts of land lying in the counties of Nicholas and Clay, and State of West Virginia, viz : One tract lying in the "Bend of Gauley," in Nicholas county and State of West Virginia, containing two thousand acres, more or less, the exact number of acres to be ascertained by the county surveyor, at the earliest day practicable, and certified by him on the back of this agreement; the title and description of which tract of land are as hereinafter stated, at so much per acre as may be determined by Messrs. George Brown, Samuel J. Grose and Joseph Copenhaver, being disinterested and responsible land owners, in the said county, the price per acre to be certified by them on the back of this agreement, to be paid for in the eight per cent preferred stock of the said Chesapeake and Ohio Railroad Company, at its par value. The certificates of stock to be issued in three months next ensuing. The title to the land clear, and in no way encumbred, except there are some $300 due, back money, on the "Bend of Gauley" plantation." These are the provisions of the contract, and it is under seal. It is not pretended that the Company, or its agent, had any previous notice, or knowledge, of the time or place the valuers would proceed to make the valuation or award of valuation ; nor does it appear that the Company or its agent was informed or

had previous knowledge or notice, that the valuers had or would accept the trust, and make the valuation, or that the Company or its agent, was present or had any knowledge of the valuation being made until long after the date of the certificate or award of valuation. It is clear, to my mind, from the provisions of the contract, that it was contemplated, by the parties, that the price or value of the land, to be determined by the valuers, was the money price or value of the land, and none other; else why provide in the contract that when the price or value was ascertained it should be paid in the eight per cent. preferred stock of the Company at their par value. If the value of the land is appreciated because to be paid for in supposed depreciated railroad stock, then the sale is not for the value, in money, to be paid in railroad stock at its par value, but for the value in depreciated stock. In other words, in that case, dollars in money are not the standard of the valuation, but dollars in the depreciated stock. The deposition of each of the valuers has been taken, and from their depositions it is clear that they did not pretend or intend to ascertain or fix the value of the land in money, and that the $16.50, stated in their certificate or award as the value per acre of the land, is not their judgment or determination of the money value per acre, and was not so intended, but their determination of the value in dollars in supposed depreciated railroad stock, depreciating the stock, in fact, at from one to two-thirds. Joseph Copenhaver, in his deposition, says that he did not examine the land with a view to form a valuation, and that he cannot say that he had such sufficient knowledge of the land as to enable him to value it correctly; that they valued the land in reference to the money a good ways off, and a long time, and a good deal of trouble to get it; that he, or they, put the price higher, because the pay was slow and a good ways off; that he could not value the land at more than $5 per acre in cash, and at about $6 per acre in money, to be paid at six, twelve and eighteen months;

that in valuing the lands at $16.50 per acre, he regarded
it as very uncertain about Rucker getting his pay; that he might never get it; that the land was to be paid for in stock which he regarded as worthless—hence he valued the land so high; that he is forty years old, and has lived about thirty-five years in the immediate vicinity of the land; that he cannot say how often he had been on the land, but had been over it many times; had traveled over more of the land the winter prior to the taking of his deposition than he had before; that he had heard the land included the river cliffs all around from the Copenhaver branch to the lower end of the Nutter place, and some half of the river bed; did not know for certain that it included the river bed. His deposition was taken the 25th of March, 1872. Grose, in his deposition, when asked, "Did you examine said farm in reference to the various provisions of said contract, so as to fix a fair value upon said lands in money?" answered, "I read the contract; did not go over the land, but had a general knowledge of the land sufficient, as I thought, to fix the valuation of it." He says that in fixing the valuation, as well as he recollects, they took into consideration the probable value of the Railroad stock; from the best information they had they valued the land in reference to the stock, as well as money; that he had some knowledge of railroad stock; gathered it from railroad meetings, from speeches by Shannahan, Paxton and Walker: perhaps he had information from other sources; that he valued the land in reference to money and railroad stock; that if the "Bend of Gauley" was his he would not take less than $10 per acre for it; he paid for his lands, which adjoin, from $13 to $15 per acre; there is not as much rough land on his, but some conveniences on the "Bend of Gauley" farm which are not on his; bought his land in a lump and not by the acre; he is not positive that in estimating the "Bend of Gauley" farm they took into the estimate the cliffs and bed of Gauley, but thinks they did; he does

not know how many acres were embraced in the cliffs and bed of Gauley; never was along when a survey was made; that he does not regard the whole tract, as worth in money or its equivalent, $16,50 per acre; he does not recollect what value he placed upon the eight per cent. preferred stock of the Chesapeake and Ohio Railroad Company at the time they valued the land; that they considered the stock as worth something, but did not think it worth dollar for dollar; don't recollect what they put it at; they were influenced, some, by the fact that the land was to be paid for in the stock of the Railroad Company, and would not have put the land as high, if paid for in cash; that he could not say that the description of the land as contained in the contract was correct; he did not survey the land or count the trees; he supposed it was correct; he did not examine how much was in clover and timothy, but knew a good deal was in; that Rucker was constantly sowing grass seeds; and they did value the land on the supposition that the description of the land in the contract was correct; the certificate as to the valuation looks like the handwriting of Rucker; that he is nearly forty years old, and has been more or less acquainted with the land since he was a little boy; clover and other grasses freeze out of the ground in a few years in that region of country; he regards the Gauley farm as worth at least $10 per acre in cash, perhaps more. George Brown, in his deposition, says that, in valuing the land, they had both money and railroad stock in view; that he regarded the Gauley farm as worth about ten or eleven dollars per acre in cash, according to the way lands around it are valued; in valuing the land, the river cliffs and the river bed were spoken of; the contract was read in his presence, and he thought the description correct; he did not go upon the farm and examine it carefully before they valued it; he was over the farm a good deal before that time; was acquainted with the land nearly all his life, and is now forty-six years old. Rucker admits

before the commissioner that he wrote the certificate of valuation. The Company examined eight other witnesses, as to the money value, per acre, of this land, and some of them fixed the value at over $5 per acre, and most of them under that amount. Some of these witnesses sold parts of the land to Rucker. Rucker also examined several witnesses on the same subject. The contract containing the description of the land was written by Rucker, and it appears from the evidence of Grose, one of the valuers, that the valuers, in making such valuation as they did, made it on the supposition that the description of the land, as contained in the contract, was correct. They did not acquire such knowledge by examination of the tract and its boundaries, with reference to its value per acre, as would enable them to approximate a correct judgment upon the subject. They seem to have received and took the description of the land, title and improvements, &c., as stated in the contract, as being correct, without having satisfied themselves of its correctness by examination or view of any description after the date of the contract, or examination of the lands and improvements, &c., thereon, with reference to ascertaining or fixing the value per acre, prior to the date of the contract. I think it is manifest that they took it for granted, in making up their award, that the description of the land, improvements thereon and the title thereto, as contained in the contract, was true, as in the contract stated, and that they, in determining the value, did take that description as true, and that it influenced them in making their award. And this, too, in the absence of the Company, or its agent, and without any effort to obtain other information on the subject. It follows that if they fixed, or were influenced in fixing, the valuation upon the hypothesis that the written description in the contract was correct, and the "description" itself is materially false or untrue, that the valuation is also necessarily false and incorrect. I think it clear from the evidence that the description of the land, im-

provements, &c., contained in the contract, did influence the valuers in fixing the value of the land in their award. After a careful examination of the description of the land, the title thereto and the improvements thereon, &c., as contained in the contract, the descriptions and exhibits filed in the cause, and the whole case, it seems to me that some of the material representations made by Rucker to the Company and its agent, in the description of the "Bend of Gauley farm," the title, improvements thereon, &c., as contained in the contract, which was written by Rucker, are misrepresentations, and were not true at the date of the contract, and that they were materially false and untrue at the date of the said contract, and that such misrepresentations, so made, were each, under such circumstances, as in law, to constitute a positive fraud in Rucker as against the Railroad Company; that such material misrepresentations of the land, the title thereto, and the improvements, &c. thereon, did materially influence and induce the Company and its agent to make the contract of purchase of the "Bend of Gauley farm," and did influence the valuers appointed to value the land, in fixing the value thereof, in their award; the misrepresentations, as made, not only affect the contract with fraud, but also, under the circumstances, enters into and taint the award of valuation with the fraud. In construing this contract, the description of the land, title, &c., being contained in it, as made by Rucker to the Company and its agent, must be considered as a part of the contract, and of the consideration which induced the Company and its agent to make it. The contract, as written by Rucker, in contemplation of law for him, undertakes that the title and description of the land are as in the contract described. The description was inserted by him for some purpose, and Alderson, the agent, in his deposition says, that at the time he signed the contract he did not know, that the representations contained in the contract, and the description as given of each tract were true; that he signed the contract on the represen-

tation of Rucker, who prepared it ; that some of the facts he knew to be true in relation to the "Bend of Gauley" tract ; he knew there were two very comfortable log houses on the farm, and also a new building erected, but not completed ; he knew that a considerable quantity of land was cleared ; did not know the amount of acres cleared, and knew a number of fruit trees to be on the farm ; did not know the number of fruit trees ; he knew that there was a good deal of valuable timber on the land ; he knew that there was a good deal of fencing and some portion in grass.   He further says, in a previous part of his deposition, that he did not, before signing the contract, as agent of the Company, go upon all the land, mentioned in the contract, and carefully examine the same ; that he had been over a portion of the "Bend of Gauley" tract, called the Nathaniel Foster tract, but he did not know the character, quality, quantity and condition of each and all the tracts so sufficiently as would enable him to fix a fair cash value upon each tract, and therefore Rucker and he entered into the written agreement dated the 20th of June, 1868, leaving the valuation of the whole of the "Bend of Gauley" tract to Samuel J. Grose, George Brown and Joseph Copenhaver, who lived in the immediate neighborhood of the land, whom he regarded as honorable men, and being well acquainted with the tract he thought them better judges of the value of the land than he.   The substance of the evidence of Alderson, the agent, upon this point is, that he did not know the character, quality, quantity, and condition of each and all of the tracts composing the "Bend of Gauley" tract ; that he had been over one of the tracts ; that he signed the contract on the faith of the representations of Rucker.   The evidence of Alderson is not impeached in any wise.   Rucker, it appears, was at and before the date of the contract well acquainted with the "Bend of Gauley" land.

It does not distinctly appear whether Rucker was present with the valuers during their consultation, but I

1874.
January Term.

Dickinson
v.
Railroad Co.

infer that he was with them or some of them, and knew their determination before the certificate or award was signed, from the fact that he wrote it. He must have produced or furnished the contract to the valuers as the certificate or award purports to be written on the back thereof, and one of the valuers says he read it, and another that he heard it read. It is not common for one of the parties to a reference to write the award of the arbitrators. It does not distinctly appear whether Rucker wrote the certificate, or award, at his own instance, or at the request of the valuers, but, it fully appears that he prepared it, and certainly wrote it, strongly in his own interest. The award is couched in such language as makes the arbitrators certify *prima facie* to two material points or facts therein erroneously stated to-wit:

*First*, that they had carefully examined Dr. Wm. P. Rucker's "Bend of Gauley" plantation, in accordance with the provisions of the agreement referring the matter to them, when from their evidence they had made no examination of the plantation after the contract; and,

*Second*, that the tract of land is worth $16.50 per acre, when, according to their evidence, they did not determine the cash or money value of the land, but determined as I have before stated. It would be difficult to construe the certificate or award upon its face otherwise, than that the valuers had carefully examined the land after the matter had been referred to them, by the contract or agreement, and had determined the land to be worth $16.50 per acre, in money. Whether the award was written in the language it is, by mere accident or for a fraudulent purpose, it was certainly deceptive upon its face and tended strongly to mislead and deceive the Company or its agent. Alderson seems to have known the arbitrators. and to have reposed confidence in them, and it was not unlikely that he might accept the award as true and fair for the Company, as its agent, without suspecting any wrong or fraud.

It does not appear, by evidence other than the valuers

what was the money value of the 8 per cent preferred stock of the Company; whether it was below or above par; nor does it appear by the evidence of the valuers that they had any accurate or sufficient knowledge of the fact or evidence before them to establish the fact. They acted upon the hypothesis that it was not worth in money its par value, but how much they considered its money value, below par, they do not state, but we are left to infer from their statements as to the cash value of the land.

The certificate of valuation can not be considered as more solemn, more conclusive, or binding upon the parties, than an ordinary award. It is but an award; and the referees cannot, upon principle, be considered otherwise than as arbitrators. Chancellor Kent, in his very lucid and able opinion in the case of *Underhill v. Van Cortlandt*, 2 Johns., Ch. (N. Y.) 339, holds and treats such a reference as a submission to arbitration, and the determination or decision as an award. In further considering this subject I shall treat and consider the valuers as arbitrators and their certificate as an award. "The decision by arbitration is the decision of a tribunal of the party's own choice and election. It is a popular, cheap, convenient and domestic mode of trial, which the courts have always regarded with liberal indulgence; they have never exacted from these unlettered tribunals, this *rusticum forum*, the observance of techninal rule and formality. They have only looked to see if the proceedings were honestly and fairly conducted, and if that appeared to be the case, they have uniformly and universally refused to interfere with the judgment of the arbitrators." See opinion of chancellor Kent in same case. While this is true, courts, especially courts of equity, it is well settled, will in proper cases look into and examine the proceedings of arbitrators to a certain extent and if it is found in conformity with the established rules, that in any given case the arbitrators have been guilty of corruption or fraud, partiality, misconduct or gross or palpable mis-

take, or excess of power, in making their award, the court will set it aside, and declare it null and void. See same opinion, and the numerous English and American decisions there cited. 1 Wash. 156, 193; 1 H. & M., 67; 2 H. & M., 408; 2 Munf., 8; 5 Munf., 10; 6 Rand., 529; 3 Rand, 2; Caldwell on Arbitration, 158, 159 and note 1. In the case of *Lee v. Patillo*, 4 Leigh. 436, an award was set aside on the ground of circumstances in the conduct of the arbitrators amounting to misbehaviour, though not to corruption, and resulting in injustice to one of the parties.

It is settled, by the authorities, that a court of equity will, and should, set aside and annul an award for fraud or imposition on the part of the party attempting to set up an award, by means of which the arbitrators were deceived. In such case, the result is not the deliberate and fair judgment of the judges chosen by the parties. It may be a true judgment, upon a case falsely imposed on them by the fraud or imposition of the party. See case of *The Boston Water Power Co., v. Gray*, 6 Metcalf, (Mass.,) 131, and the case of *Underhill v. Van Cortlandt*, 2 Johns. Ch., (N. Y.,) 339; Caldwell on Arbitration, 170, 171, 172, and cases there cited.

A party to an award cannot come to have it set aside upon the simple ground of an erroneous judgment,—there must be something more—such as above stated. Caldwell on Arbitration, 158, 159, and the numerous cases cited in note one, and the cases hereinbefore cited. In the case of *Jenkins v. Liston*, 13 Gratt., 535, it was held, that "arbitrators having received a paper, without the knowledge or consent of one of the parties to the arbitration, though they say that their opinions were formed before it was received, their award is void."

There seems to be some difference of opinion as to whether a court of equity will, or ought to regard the proceeding by arbitrators, to consider a matter referred to them, and making an award thereon in the absence of a party, and without notice to such party of the time or

place of their acting, as being such misconduct in the
arbitrators, or sufficient cause to authorize or require the
court to set aside an award. This question has not been
fully determined by the Supreme Court of Appeals of
Virginia, or of this State, so far as I am aware. In the
case of *Miller v. Kennedy*, 3 Rand., 2, which was an ac-
tion at law, it was held, that "It is not universally true,
that *notice* should be given of the time and place of mak-
ing an award. But, if notice be necessary, the defend-
ant cannot avail himself of the want of it, where the
submission has been by the *mere act of the parties,* nor of
*corruption or partiality* in the arbitrator, nor of any other
extrinsic circumstance whatever, in an action on the
award, or on a submission bond; but his only redress is
in a court of equity. *Aliter* if the submission be by
*order · of court.*" Judge Cabell, who delivered the opin-
ion of the court, in that case, says : "It is highly proba-
ble that justice would require, in · most cases, that such
notice should be given. But there are many cases in
which it would not be necessary. The case may be one
not depending on evidence ; or all the facts may have
been agreed, and made known to the arbitrators." The
only question before the court was, whether the want of
notice to the defendant from the arbitrator, of the time
and place for examining the matters submitted for the
decision of the arbitrator, was a good defence against an
award in an action at law founded thereon, and the court
held that it was not; but further held, that in most cases
justice would require that such notice should be given,
and, that want of notice, even if that were a case re-
quiring notice, could not be taken advantage of in that
action, but that the proper remedy was, as in cases of
*corruption or partiality* in the arbitrators, in a court of
equity. In the case of *McCormick v. Blackford*, 4 Gratt.,
133, it was held, that, "It is misbehavior, in arbitrators,
to meet and make their award in the presence of one of
the parties, and in the absence of the other, who wished
to introduce other evidence before them, and without

notice to him." Caldwell on Arbitration, 118, says : "It has been said, that it is not necessary that express notice should be given by the arbitrators when they intend to meet, the parties being bound to take notice; but this seems most unreasonable, and there is no doubt but that an award, made without due notice, given to the parties, would, at the present day, be set aside."—Kyd on Awards, 95, 96, 101. In the case of *Rigden v. Martin*, 6 Harris & Johnson, (Md.,) 403, upon a motion to set aside an award on the ground that notice of the time and place of meeting had not been given to the parties, the court said : "That the parties ought to have notice of the time of meeting, is a position so strongly supported by common justice, that it would seem not to require the aid of authorities. Every man ought to have an opportunity afforded him to be heard in defence of his rights; and it is with surprise, we find in one case, Lord Hardwicke is made to say, notice is not necessary. This opinion, however, is overruled by many authorities." See, also, *Falconer v. Montgomery*, 4 Dallas, (Penn.,) 232, in which the same principle is held. In the case of *Lutz v. Linthicum*, 8 Peters, (Sup. Ct. U. S.,) 178, Justice Story said, "Without question, due notice should be given to the parties, of the time and place of hearing the cause ; and, if the award was made without such notice, it ought, upon the plainest principles of justice, to be set aside." In *Peters v. Newkirk*, 6 Cowen, (N. Y.,) 103, the court declared that the right to notice was implied in the agreement to submit. In the case of *Elmendorf v. Harris*, 23 Wendell, (N. Y.,) 628, it was held to be a fundamental rule of construction, in reference to every transaction in the nature of a judicial proceeding, that the contract of submission necessarily implies that the arbitrator is not authorized or empowered to decide the question in controversy, without giving the parties an opportunity to be heard in relation thereto; unless by the terms of the submission, the right of the party to be heard before the arbitrator is waived ; and that therefore an award made

without notice, is void.   See, also, *Crowell v. Davis,* 12 Metcalf, (Mass.,) 293 ; *Rivers v. Walker,* 1 Dallas, (Penn.,) 81.   In the case of *Peters v. Newkirk,* 6 Cowen, (N. Y.,) 103, it was held, that where the only question submitted to arbitration was the appraisement or valuation of property, the parties have a right to notice.

From the weight of authority upon the subject, and from such reflection as I have been able to exercise, my mind has been brought to the conclusion, that sound principles, justice, and a due regard for the proper administration thereof among men, by arbitration, require ordinarily, though, perhaps not, universally, in equity, that an award made by arbitrators in the absence of parties to the submission, who are materially interested, upon matters submitted for their determination, without previous notice to such parties, or their authorized agents or attorneys, of the time and place of meeting, may be set aside in equity, ordinarily, if objected to by a party to the submission, materially interested, not having such notice and being absent, *provided,* such party has not dispensed with or waived notice or the like.

It is argued, however, that the persons chosen in the case were the agents of the parties, and their acts under the submission are binding upon them without notice. I cannot regard them as simple agents of the parties. They were chosen, not as agents, but as men, indifferent between the parties, to judge and decide fairly, justly and impartially upon the matter submitted to them. Each party was entitled to be heard by and before the arbitrators upon every point involved in the case, or which might or did enter into their consideration before or at the time of their decision.   How can parties obtain a hearing if, they claim one, before arbitrators, unless they are notified of the time and place when they may be heard by them ?   When a question is submitted to arbitration, the arbitrators selected are the court appointed by the parties for the purpose of determining the

1874.
January Term.

Dickinson
v.
Railroad Co.

question between them; they constitute the court; but the time and place of their meeting to hear and determine the case is not fixed by law, and if they are not fixed in the submission, unless the arbitrators fix them, and the parties have notice thereof, they have no assurance whatever of being heard in any case, or that their cause, rights or interest will receive due or just examination and consideration or decision at the hands of the arbitrators. One party being more officious or favored than the other, might learn the time and place of meeting, while the other did not, and attend, and with *ex parte* evidence, or otherwise, gain an undue advantage with the arbitrators; while if the opposite party were present, it might, and would, most probably, be otherwise The encouragement of arbitration among the people I think clearly demands adherence, generally, to the rule I have announced upon that subject, and justice certainly demands it.

The award in this case, is obnoxious to the following objections. *First.* The award was made in the absence of the appellant, its agent or attorney, and without notice to it, its agent or attorney of the time and place of the meeting of the arbitrators to consider and award upon the subject referred to them for determination. It not appearing that the appellant, its agent or attorney, dispensed with or waived notice or the like. *Second.* The description of the land, &c., contained in the contract, which was made by Rucker and is a part of the contract, was before the arbitrators, and the description being false and fraudulent in material particulars and the arbitrators in making their award in the absence of the Company, its agent or attorney; having acted upon the description as being true, and were evidently influenced thereby in making their award. The award must therefore be regarded as having been procured by fraud and imposition and for that reason is not valid or binding upon the Company. *Third.* Though the simple fact that Rucker

(one of the parties) wrote the award in the absence of the Company, its agent or attorney, may not, of itself, be sufficient to make it invalid, still, it may be considered unexplained, as affording just ground for suspicion, and criticism. But Rucker having written the award, and so wrote it, as that it is materially erroneous and deceptive in his favor, for the arbitrators to sign, and they did sign it as written, the award may be held invalid in a court of equity under the circumstances, appearing in this case. *Fourth.* When the value of property in money is referred to arbitrators and they fairly execute the submission, generally, the award can not be set aside or determined to be invalid, upon the ground that the valuation is exorbitant—To hear complaints of this description against awards would amount to allowing an appeal to court from the fair and honest judgment of the arbitrators upon the question referred and would defeat the obvious purpose of the submission; but where the arbitrators fail to determine the value in money, according to the submission, but in fact determine the value in something else, which, from the face of the award, appears to be the money value, but was clearly not so intended by the arbitrators, it is, and properly should be, otherwise. I don't regard it as material, under the circumstances, to determine whether the arbitrators were guilty of misconduct in making an award without knowing the boundaries of the land or without having examined the land after the question of value was submitted to them.

I think the court below properly disregarded the award of the surveyor as to the quantity of acres in the "Bend of Gauley" tract, for the reason that his determination of quantity was not derived from actual survey made from the title papers, but from calculations made from data not altogether obtained from the title papers, but in part at least from instructions given by Rucker, some of which the surveyor says he did not know to be correct and some were not correct. For instance the surveyor says that he included in his estimate one half of the bed

of Gauley river, being about eight poles, for a distance of eight hundred and sixty poles, and this he did by the direction of Rucker, when he says the title papers as he thinks, do not include the half of Gauley river. The surveyor does not seem to have run more than one line and he commenced to run and ended that, not by title papers before him, but by and according to the directions of Rucker. And I think the court was right in disregarding the award of the surveyor in this case under the circumstances and for other reasons, such as the want of notice to the appellant or its agent, of the time and place of making the survey, &c., the appellant not being present by agent or otherwise, and not having dispensed with or waived notice.

The description of the two hundred and fifty acre tract on the waters of Buck's garden, &c., in the contract mentioned, is a misrepresentation in material particulars, as clearly appears from the evidence of surveyor Robinson, Cowan and others. The agent of the Company signed the contract relying upon the representations of Rucker as before stated.

There is no evidence filed in the cause tending to show whether the representations made of the one hundred and seventy-five acre tract in Clay county, were true or false.

Five hundred and sixteen acres of the the "Bend of Gauley" tract conveyed to Rucker by David R. Hamilton by the deed made the 6th of August, 1865, was at the date of the contract, and still is, encumbered with the contingent dower interest of Hamilton's wife. This encumbrance, from the evidence, was known to Rucker at the date of the contract. Still he represents, and in fact undertakes, in and by the contract, that the title to this tract is clear and in no way incumbered. Rucker admits in his answer that he has but an undivided interest in twenty-five acres of the "Bend of Gauley" tract but does not state the amount of the interest nor in what

part of the tract the twenty-five acres is located. I in-
fer that it is the twenty-five acres, one moiety of which he purchased from Jacob Copenhaver. There appears in the record a paper purporting on its face to be a deed from Copenhaver and wife to Rucker for one half of twenty-five acres. This, I suppose, is the undivided interest which he claims in the twenty-five acres. This paper, purporting to be a deed, is not a deed, it has no seal or scroll attached to it. *Pratt & Fox v. Clemens*, 4 W. Va., 443. The certificate of acknowledgement by the wife is not sufficient to bar her of dower.

The paper filed with the record purporting to be a deed from O. S. Jones and wife, dated 5th of October, 1865, for thirty acres of land, is not a deed, because not made under seal. These two deeds do not pass to Rucker the legal title, but only an equitable title. The legal title appears to be outstanding. The paper writing from Jeremiah Nutter to Rucker for one hundred and seventy-two acres of "Bend of Gauley" farm which was acknowledged the 3rd of May, 1869, and was admitted to record May 11th, 1869, does not seem, from the record before me, to have been acknowledged according to law, at least as to the wife. The certificate of acknowledgement to this deed is not sufficient to bar the wife of dower, as it is not substantially in conformity with the form prescribed by law. The tract of one hundred and seventy-five acres in Clay county, it appears, was sold by the Sheriff of that county, in the year 1869, for the taxes of 1868, charged on the same, against Rucker; and one James M. Welch, became the purchaser, at the sale, and the land not being redeemed within the time prescribed by law, the Recorder of Clay county made a deed to the purchaser for the land on the 6th of January, 1871. The taxes for the year 1868 were charged againt Rucker, for this tract, and constituted a lien thereon, before, and at the date of the contract of sale, and of the alleged deed of Rucker and wife. Rucker contracted to make a deed of general warranty to the Company. It was

Rucker's duty under the state and circumstances of the case, to pay the taxes on the land for the year 1868. In consequence of the tax not being paid, the land was sold therefor, and a deed was made to the purchaser for the purchase money in consequence of the sale and failure of Rucker to redeem, after the sale. Such sale, and failure to redeem, under the circumstances of this whole case, the contract, fraud, &c., hereinbefore ascertained touching the contract, &c., must be considered to have been by reason of the default of Rucker, and not by the default of the Company, which, so far as appears, had no actual knowledge or notice, that the taxes for said year were unpaid, or that the sale for taxes was made. Rucker knowing of the taxes and that they were charged against him, and that they were his to pay, or see to, the Company not having agreed to pay the same, should have paid them in proper time, and the Company should not be made to suffer by reason of his default, if the land should be lost.

It does not appear that the Company ever took actual possession of any part of either tract of land in the contract mentioned, or ever exercised any ownership or control over any or either of them. By the contract the "Bend of Gauley" farm was to remain in the possession of Rucker until the 1st of January, 1872. "Fraud avoids a contract, *ab initio*, both at law and in equity, whether the object be to deceive the public, or one party endeavor thereby to cheat the other. For the law will not sanction dishonest views and practices, by enabling an individual to acquire through the medium of his deception, any right or interest." "Fraud invalidates every transaction, as well at law as in equity." Chitty on Contracts, 8 Am. ed. 586, and note 1. Same author, 589 says : "But if a party, for a fraudulent purpose, states a fact which is untrue, and without knowing it to be true and he does not, at the time, believe it to be true, this is both a legal and a moral fraud. And when the representation, expressly or impliedly, forms part of the contract

between parties, it is not essential, in order to invalidate the contract, that there should have been moral fraud in making such representation." If, upon a sale, the vendor makes material representations of matters of fact, as of his own knowledge, and they are in fact untrue, and the vendee is deceived thereby, the sale will be voidable, although the vendor did not know whether they were true or not." Same author, 589, latter clause of note 1. "When the party intentionally, or by design, misrepresents a material fact, or produces a false impression, in order to mislead another, or to entrap or cheat him, or to obtain an undue advantage of him; in every such case there is a positive fraud in the truest sense of the terms. There is an evil act with an evil intent; *dolum malum ad circumveniendum*. And the misrepresentation may be as well by deeds or acts as by words; by artifices to mislead as well as by positive assertions." 1 Story. Eq.; Juris. sec. 192." Whether the party, thus misrepresenting a material fact, knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know or believe to be true is equally, in morals and law, as unjustifiable, as the affirmation of what is known to be positively false. And even if the party innocently misrepresents a material fact by mistake, it is equally conclusive; for it operates as a surprise and imposition upon the other party." 1 Story Eq. Juris., sec. 193. See *Crump v. United States Mining Company*, 7 Gratt., 352. From the evidence and law I feel compelled to regard the contract in this case as having been procured by Rucker from the agent of the Company, by actual or positive fraud, and to treat it accordingly.

It is maintained however, by the counsel of appellees that the Company by its authorized agent, John A. Hamilton accepted the deed from Rucker and wife, long after the contract, and award were made, and allowed, and permitted the stock contracted for in the contract, to be represented at the meetings of the stock holders without ob-

jection, and that the Company by these acts recognized and ratified the contract and award, and waived all right to object to the enforcement of the same on account of fraud or misconduct in the arbitrators, &c. The award of the arbitrators is dated the 6th day of July, 1868 and the survey the 3rd day of August, 1868, and the deed from Rucker and wife was acknowledged by Mrs. Rucker on the 1st day of September, 1868, and by Rucker on the 18th day of the same month and year. For some cause this deed recites that it is in consideration of the sum of $5 only. No other consideration is stated in the deed, and no lien is retained for any purpose, and no mention made of railroad stock. On the 18th day of September Rucker delivered the deed to John A. Hamilton, as an escrow, to deliver to the Company as his deed, upon condition that the Company first pay to Hamilton, as per contract between Rucker and the Company, dated 20th of June, 1868 as appears by the written endorsement on the deed, made and signed by Rucker, at the time he delivered the deed to Hamilton. From this it clearly appears that the deed was not then delivered to Hamilton as the agent of the Company, but in fact, as the agent of Rucker—Hamilton was to act in the matter of the receipt of the purchase consideration, and delivery of the deed for Rucker and as his agent. Afterwards, about the 9th day of October, 1868. Rucker for some reason, not satisfactorily explained by him, went to Hamilton and verbally stated to him that he wished to make an unconditional, delivery of the deed to him, and then and there directed Hamilton to present the same to the Recorder of Nicholas county for recordation, and after the same was recorded in said office to withdraw the original and send it to the Recorder of Clay county to be recorded in his office; and on the 9th day November, 1869, Hamilton, as directed by Rucker, delivered the deed to the Recorder of Nicholas county, to be recorded. Hamilton in his deposition says that Jos. A. Alderson and himself were appointed local agents of the Company, as

I understand him, for the purchase of lands in its 8 per cent. preferred stock, but he does not state when, how or by whom he was appointed, or that he ever made any purchases for the Company. He says Henry M. Mathews the general agent directed him in several letters to obtain deeds from all parties whose contracts had been approved by the Company, but does not state when any of the letters were received, and that he understood without saying from whom, that the contract of Rucker had been accepted by the Company, and he is under the impression that he was told by some one connected with the business, but he does not say who or how connected with the Company's business, that it was necessary to record the deeds before forwarding. He does not state that he ever forwarded this deed to the Company. Farther on Hamilton is asked what instructions were given you by H. M. Mathews, the general agent of the Company as to procuring and forwarding deeds for lands sold by parties to it, and in answer thereto he says Major H. M. Mathews directed him to procure deeds from all persons who had "subscribed" lands to the Company and in which the contracts had been "approved" and forward the same, in several different letters &c.

Under these circumstances it would be unjust and unauthorized, to hold that the Company had accepted the deed to the deed because Hamilton delivered the deed to the Recorders of Nicholas and Clay counties as directed by Rucker. I think it is clear that in doing as he did, in this respect, he was acting under the direction and authority of Rucker, and not of the Company. According to the most liberal construction of his evidence he was only authorized to receive deeds upon such contracts as had been approved by the Company. He did not make this contract, and so far as appears, he knew nothing of its import, or anything touching the action or proceedings of the arbitrators or surveyor. It does not appear that he ever saw or examined any of the lands in

56

any capacity, or that he was informed by any person who could bind the Company that the contract or award or either of them, were ever approved or adopted by the Company, after the date of the contract. From what appears Hamilton had no information in relation to this contract, except such as he derived from Rucker, and was in a condition to be imposed up by him. Why did not Rucker deliver this deed to Alderson, the agent who made the contract, if he expected it to be accepted? No excuse or reason is assigned by Rucker for not doing so. It may be appropriately asked why Rucker changed his mind so soon after he delivered it to Hamilton as an escrow? At that time he was not willing to trust the Company with the deed until the consideration was paid. His change of mind in this respect is not satisfactorily explained. I do not think it can be justly said that the Company accepted the deed upon a reasonable view of the case and the circumstances as developed by the record.

There is no proof of the allegation that the stock in question was represented in the general meetings of the stockholders of the Company, that I have been able to find in the record outside of Rucker's allegation.

If the contract and award were not obnoxious to fraud, &c., and it were proper to enforce them as against the Company, still, under the provisions of the first and second sections of chapter one hundred and eighteen of the code of Virginia, of 1860, which were in force in this State at the date of the contract, &c., as well as the first and second sections of chapter seventy-four of the code of this State, which took effect the first of April, 1869, and the principles settled in the cases of *Chamberlayne v. Temple*, 2 Rand, 384; *Garland v. Rives*, 4. Rand, 282, 310; *Hutchison v. Kelly*, 1 Rob., (Va.) 123; *Hunters v. Waite*, 3 Gratt., 26, the provision or settlement contained in the contract for the benefit of Rucker's wife would be held fraudulent and void. As to the plaintiff Dickinson's debt, except perhaps as to so much thereof as would be a just equivalant for the right of dower relin-

quished by the wife by the deed of Rucker and wife to the Company, but as to this exception, I do not now determine. In the case of *Garland v. Rives*, judge Green, in delivering the opinion of the court, says : "To this class of cases may be referred those cases in which a husband stipulating to settle on his wife a just equivalent for her right of dower, relinquished with a view to defraud his creditors, settles property grossly exceeding in value the dower, in which case it was held that the deed was valid, so far as to secure the just equivalent, and void as to the surplus. In these cases, the wife is held to be an innocent and *bona fide* purchaser, to the extent of the value of the dower right relinquished, and the fraud of the husband is not imputed to her. But if she were *sui juris*, and concerned in the fraud, the deed would be wholly void under the statute of frauds and perjuries.".

1874.<br>January Term.<br>Dickinson<br>v.<br>Railroad Co.

It must be taken in this case, under the pleadings, and evidence as against Rucker, his wife and Bryan, that, though Dickinson's judgment was obtained after the contract, and the date of the deed of Rucker and wife, his debt for which the judgment was rendered, existed before, and at the time the contract was made. But, if the contract and award were good, and also the deed of Rucker and wife, to the Company, then I apprehend the judgment would not be a lien upon any part of the stock to be issued, as a judgment is only a lien upon real estate. In as much as the contract, so far as it settled the stock upon Mrs. Rucker, is fraudulent and void as to Dickinson's debt, to the extent I have stated, to that extent, the stock would be liable to Dickinson's debt, even though there had been no judgment or execution thereon. Code of 1860, chap. 179, sec. 2, and Code of W. Va., chap. 133, sec. 2. But the contract never was recorded, nor the deed accepted by the Company in my judgment, as hereinbefore stated.

If the contract of sale to the Company, and the deed of Rucker and wife to the Company are set aside, and annulled, as they must be, for the reasons herein stated,

then Dickinson's judgment constituted a lien upon the bonds mentioned in the deed and contract, and should be, as far as necessary, subjected to sale therefor, unless it is paid. But the sale should be made subject to the dower of Mrs. Rucker, if she survives her husband. I do not determine anything as to the liability to Dickinson's debt or judgment of any of the real property in his bills mentioned, other than that alleged to be sold to the Company, as I deem it improper to do so in this appeal. In this case the cross-bill may be considered as a defence to the original, or a proceeding necessary to a complete determination of a matter already in litigation. Story's Eq. Plead, sec. 399.

For these reasons the decree rendered by the Circuit Court of Greenbrier county, in these causes, on the 26th day of April, 1872, must be reversed and annulled, and the appellant recover against the appellee, William P. Rucker, its costs about the prosecution of its appeal, in this Court, expended.

Paull and Moore, Judges, concurred. Absent, Hoffman, Judge, by reason of sickness.

The decree entered in this case was as follows: And this Court, proceeding to render such decree as the said Circuit Court should have rendered in said causes, it is adjudged ordered and decreed that the contract of sale of the lands in the original and cross-bills, in these causes, mentioned, bearing date the 20th day of June, 1868, between the defendant, William P. Rucker, and the Chesapeake and Ohio Railroad Company, and executed by the said William P. Rucker, for himself, and J. A. Alderson, agent for the appellant, and the award or valuation, of George Brown, S. J. Grose, and Joseph Copenhaver, fixing the value of the "Bend of Gauley" farm at $16.50 per acre, and dated the 6th day of July, 1868, in said bills mentioned, and the certificate or award of J. Haymond Robinson, surveyor of Nicholas county, dated August the 3d, 1868, and in said bills mentioned,

certifying that, by calculation, he finds the "Bend of Gauley" farm, in the said contract mentioned, to contain eighteen hundred and sixty-six acres of land including one-half the width of Gauley river, from a water birch on the bank of same, a distance of eight hundred and sixty poles long, allowing the half-width of the river to be eight poles; and the deed from the defendants, William P. Rucker and Margaret A. Rucker, his wife, to the appellant, dated the 18th day of September, in the year 1868, and of record in the counties of Nicholas and Clay, in this State, in said causes mentioned and referred to, purporting to convey to the appellant, (the Chesapeake and Ohio Railroad Company) "the three following tracts of land with general warranty, to-wit:

*First.* A tract of eighteen hundred and sixty-six acres, lying in the "Bend of Gauley" river, in Nicholas county, West Virginia, adjoining the lands of S. J. Grose, Jos. Copenhaver, A. J. Kyle, and others, and being the same lands conveyed to said Rucker by James A. Foster, R. G. Foster, A. B. Foster, D. R. Hamilton, Oliver S. Jones, Jeremiah Nutter, and Jacob Copenhaver;

*Second.* Of two hundred and fifty acres, lying in Nicholas county, West Virginia, on the waters of Buck's garden, Buffalo and Mumblethepeg creeks, about nine miles north of the Court-house, and adjoining the lands of Levi J. Hooker, John Rapp, Major Burroughs, and others, and conveyed to Rucker by said Levi J. Hooker; and;

*Third.* A tract of one hundred and seventy-five acres, lying in Clay county, West Virginia, on waters of Elk river, known as the John Legg farm, three and a half miles north of the Court-house, adjoining lands of Samuel Martin, Smith Henshaw and others, and conveyed to said Rucker by John Legg," be, each and all, cancelled, rescinded and annulled, and they, each and all, are hereby declared null and void and of no effect. It is further adjudged, ordered and decreed that the said Chesapeake and Ohio Railroad Company do recover against the de-

1874.
January Term.

Dickinson
v.
Railroad Co.

fendants to its cross-bill, filed in this cause, its costs, expended in and about the prosecution of the same, in the Circuit Court.

It is further adjudged, ordered and decreed, that the said original cause of Russell J. Dickinson against William P. Rucker and others, be remanded to the said circuit court of the county of Greenbrier for further proceedings therein to be had, and the said circuit court may, if it be desired, appoint a special commissioner to reconvey with covenants of special warranty, to the said William P. Rucker, for, and on behalf of, the said Chesapeake and Ohio Railroad Company, by deed properly acknowledged, whatever legal or equitable title or interest, of every description, which may have passed from the said William P. Rucker and wife, by their said deed bearing date the 18th day of September, 1868, to the said Chesapeake and Ohio Railroad Company, for the lands in said deed mentioned and described and every part thereof, and the said circuit court may further proceed in said original cause, and make such further orders and decrees therein as are in accordance with the principles announced in this opinion, so far as they apply, and as are in accordance with the rules and regulations governing courts of equity, and that the said Russell J. Dickinson have leave to file an amended bill making James A. Foster a party to said original cause and any other persons necessary and proper to be made parties thereto, and that said Dickinson have leave to file in said original cause an official copy of the said judgment against William P. Rucker to be read as evidence and to have such force as it is entitled to have.

DECREE REVERSED, AS TO ORIGINAL BILL, AND SUIT REMANDED.